# UNITED STATES DISTRICT COURT

for the

Southern District of California

FILED

JUL 15 2019

CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY _____ DEPUTY

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )
)   Case No.   **19MJ2955**
Apple Cellphone )
FPF No. 2019250600082002 )
)

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A-2

located in the ___Southern___ District of ___California___, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| 21 U.S.C. §952, 960 and 963 | Importation of a Controlled Substance and Conspiracy to Import a Controlled Substance. |

The application is based on these facts:

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Gary Roy, HSI Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 7/3/19

_____
*Judge's signature*

City and state: San Diego, CA

Hon. Jill L. Burkhardt, United States Magistrate Judge
*Printed name and title*

# AFFIDAVIT

I, Gary Roy, Special Agent with the United States Department of Homeland Security (DHS), Immigration and Customs Enforcement (ICE), Homeland Security Investigations (HSI), being duly sworn, hereby state as follows:

## INTRODUCTION

1. This affidavit supports an application for a warrant to search the following electronic device, as further described in Attachment A-1 and Attachment A-2:

    a. Apple Cellphone
       FPF No. 2019250600082001
       **(Target Device 1)**;

    b. Apple Cellphone
       FPF No. 2019250600082002
       **(Target Device 2)**

and seize evidence of crimes, specifically, violations of Title 21, United States Code, Section(s) 952, 960, and 963, as more particularly described in Attachment B. This search supports an investigation and prosecution of MARIELA PEREZ-LOPEZ and PABLO BONILLA-COLON for the crimes mentioned above. A factual explanation supporting probable cause follows.

2. **Target Device 1** and **Target Device 2**, (collectively, the **"Target Devices"**) were seized from the vehicle driven by PEREZ-LOPEZ and occupied by BONILLA-COLON on May 31, 2019 at the time of their arrest at the Otay Mesa, California Port of Entry ("POE"), as they attempted to smuggle methamphetamine into the United States. The **Target Devices** are currently being held securely at the U.S. Customs and Border Protection Permanent Vault at 9495 Customhouse Plaza in San Diego, CA, 92154.

3. Based upon my experience and training, and all the facts and opinions set forth in this Affidavit, there is probable cause to believe that a search of the **Target**

1

**Devices** will produce evidence of one or more of the aforementioned crimes, as described in Attachment B.

4. The information contained in this affidavit is based upon my experience and training and consultation with other federal, state, and local law enforcement agents. The evidence and information contained herein was developed from interviews and my review of documents and evidence related to this case. Because this affidavit is made for the limited purpose of obtaining a search warrant for the **Target Devices**, it does not contain all of the information known by me or other federal agents regarding this investigation, but only contains those facts believed to be necessary to establish probable cause for the requested warrant.

## EXPERIENCE AND TRAINING

5. I am a law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 2510(7), who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Title 18, United States Code, Section 2516. I am also a federal law enforcement officer within the meaning of Rule 41(a)(2)(C) of the Federal Rules of Criminal Procedure. I am authorized under Rule 41(a) to make applications for search and seizure warrants and to serve arrest warrants. I am authorized to investigate violations of laws of the United States and to execute warrants issued under the authority of the United States.

6. I am a Special Agent (SA) with ICE-HSI and have been so employed since February 2018. I am currently assigned to the Deputy Special Agent in Charge, San Ysidro Office, Contraband Smuggling Group 1, and my duties include investigating the trafficking of illicit controlled substances and the importation and distribution of illegal substances. I have training and experience in multiple investigative areas, to include conducting investigations and making arrests based on violations of Title 21, United States Code Sections 952, 960, and 963.

7. I have had approximately 23 weeks of intensive training at the Federal Law Enforcement Training Center at Glynco, Georgia. These 23 weeks were comprised of

2

approximately 12 weeks of the basic criminal investigator training program and approximately 11 weeks of ICE Special Agent Training. I have received training in identifying various controlled substances and conducting Title 21 controlled substances investigations. Prior to working for HSI, I worked for the United States Border Patrol, as a Border Patrol Agent, for approximately twelve years.

9. I have personally participated in and conducted investigations of violations of various State and Federal criminal laws, including those related to narcotics violations. I have arrested or participated in the arrest of persons for violations of the Controlled Substances Act. In these cases, I have conducted interviews with the arrested persons and their associates. I have conducted surveillance of narcotics smugglers as they conduct their smuggling activity while crossing the border from Mexico into the United States. Through these investigative activities, I have gained a working knowledge and insight into the typical activity of narcotics smugglers, and the structure of their narcotics smuggling networks.

10. Based upon my training and experience as a Special Agent, and consultations with law enforcement officers experienced in narcotics trafficking investigations, and all the facts and opinions set forth in this affidavit, I submit the following:

   a. Drug traffickers will use cellular/mobile telephones because they are mobile and they have instant access to telephone calls, text, web, and voice messages.

   b. Drug traffickers will use cellular/mobile telephones because they are able to actively monitor the progress of their illegal cargo while the conveyance is in transit.

   c. Drug traffickers and their accomplices will use cellular/mobile telephones because they can easily arrange and/or determine what time their illegal cargo will arrive at predetermined locations.

   d. Drug traffickers will use cellular/mobile telephones to direct drivers to synchronize an exact drop off and/or pick up time of their illegal cargo.

   e. Drug traffickers will use cellular/mobile telephones to notify or warn their accomplices of law enforcement activity to include the presence and posture of marked and unmarked units, as well as the operational status of

3

checkpoints and border crossings.

f. Drug traffickers and their co-conspirators often use cellular/mobile telephones to communicate with load drivers who transport their narcotics and/or drug proceeds.

g. The use of cellular telephones by conspirators or drug traffickers tends to generate evidence that is stored on the cellular telephones, including, but not limited to emails, text messages, photographs, audio files, videos, call logs, address book entries, IP addresses, social network data, and location data.

11. Based upon my training and experience as a Special Agent, and consultations with law enforcement officers experienced in narcotics trafficking investigations, and all the facts and opinions set forth in this affidavit, I know that cellular/mobile telephones can and often do contain electronic records, phone logs and contacts, voice and text communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data. This information can be stored within disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular/mobile telephone. Specifically, I know based upon my training, education, and experience investigating these conspiracies that searches of cellular/mobile telephones yields evidence:

a. tending to indicate efforts to import methamphetamine, or some other federally controlled substances from Mexico into the United States;

b. tending to identify accounts, facilities, storage devices, and/or services– such as email addresses, IP addresses, and phone numbers–used to facilitate the importation of methamphetamine, or some other federally controlled substances from Mexico into the United States;

c. tending to identify co-conspirators, criminal associates, or others involved in importation of methamphetamine, or some other federally controlled substances from Mexico into the United States;

d. tending to identify travel to or presence at locations involved in the importation of methamphetamine, or some other federally controlled

4

substances from Mexico into the United States, such as stash houses, load houses, or delivery points;

e. tending to identify the user of, or persons with control over or access to, the **Target Device(s)**; and/or

f. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

12. Subscriber Identity Module (SIM) Cards, also known as subscriber identity modules, are smart cards that store data for GSM cellular telephone subscribers. Such data includes user identity, location and phone number, network authorization data, personal security keys, contact lists and stored text messages. Some of the evidence generated by a smuggler's use of a cellular telephone would likely be stored on any SIM Card that has been utilized in connection with that telephone.

13. Based upon my experience investigating drug smuggling, my training, and my consultation with other investigators who have experience investigating drug smuggling in near the border, I understand that drug smugglers will seek to smuggle drugs from Mexico to the United States by hiding the drugs in hidden compartments of cars, and in non-factory compartments (*i.e.*, compartments that the manufacturer did not design for ordinary use). Smugglers will then drive north from Mexico and seek to pass through POEs with the drugs undetected. (I am also aware that such individuals will sometimes try to generate a history of crossings to show that driving through a POE is ordinary behavior for them.) When they arrive in the United States, smugglers will take the drugs to a discreet location to transfer them to other people involved in the distribution chain, who can then send the drugs to other locations for downstream distribution.

14. Furthermore, based on my training and experience, and conversations with other law enforcement officers who investigate drug smuggling and trafficking, I know that drug conspiracies often require detailed and intricate planning to successfully evade

5

detection. Consequently, drug conspiracies often involve planning and coordination for several months—this planning often occurs through mobile telephones. Additionally, based on my training and experience, and conversations with other law enforcement officers who investigate drug smuggling and trafficking, I know that coconspirators are often unaware when a fellow coconspirator has been arrested and will attempt to communicate with that coconspirator via mobile telephone after his or her arrest to determine the whereabouts of drugs that are being transported.

## FACTS SUPPORTING PROBABLE CAUSE

15. According to a report prepared by CBP Canine Enforcement Officer Grijalva, on May 31, 2019 at approximately 12:42 AM, he and his Narcotics and Human Detection Dog, "Miki," were conducting pre-primary roving operations at the Otay Mesa POE when they encountered a Toyota Camry bearing California license plate 7ERW579 (the "Vehicle"). At that time, Officer Grijalva received an alert followed by an indication to the trained odor of narcotics to the rear undercarriage of the Vehicle.

16. According to a report by CBP Officer Panache, the Vehicle then approached his primary booth. Mariela PEREZ-LOPEZ was the driver of the Vehicle, and Pablo BONILLA-COLON was in the passenger seat. PEREZ-LOPEZ stated they were going to El Cajon and had nothing to declare. During this time, CBP Canine Enforcement Officer Grijalva signaled to Officer Panache to stop the Vehicle, at which point Officer Grijalva approached the Vehicle and conducted an inspection. When Officer Grijalva inspected the gas tank and tapped the gas tank with the palm of his hand, he felt that the gas tank was unusually solid. PEREZ-LOPEZ and BONILLA-COLON were asked to step out of the Vehicle, and the Vehicle was referred to secondary inspection.

17. According to a report prepared by CBP Officer De Leon, he conducted an inspection in which he removed the screws holding the gas tank sending unit, ultimately pulling the sending unit out of the gas tank, and he observed several vacuum-sealed bags concealed inside. A total of 40 packages containing a substance that tested positive

for the properties of methamphetamine with a combined weight of 19.90 kilograms were recovered from the gas tank.

18. I was notified of the event, responded to the Otay Mesa POE, and subsequently placed PEREZ-LOPEZ and BONILLA-COLON under arrest. I further seized the Vehicle, the methamphetamine packages, and the **Target Devices**, which had been previously seized from the Vehicle.

19. PEREZ-LOPEZ and BONILLA-COLON were each advised of their Miranda rights, and each waived his or her rights. I subsequently interviewed each defendant.

20. During the post-Miranda interview, PEREZ-LOPEZ stated she knew the narcotics were inside of the Vehicle. Specifically, PEREZ-LOPEZ stated she coordinated with the drug trafficking organization (DTO) starting on May 30, 2019, to place the narcotics inside the Vehicle. PEREZ-LOPEZ stated she was being paid $5,000 to bring drugs into the United States and her intended destination was Los Angeles, California. PEREZ-LOPEZ stated she was with BONILLA-COLON when the DTO was placing narcotics in the vehicle. In particular, she said that the previous morning, she had driven the Vehicle down to Tijuana and had been instructed to take her car to Rosarito and leave it at the parking lot of a convenience store. She and BONILLA-COLON went to leave the car at that location, got into a car already waiting at the store, and then returned to Tijuana. After returning to Tijuana, PEREZ-LOPEZ received a phone call indicating that the Vehicle was ready to be picked up, at which point she and BONILLA-COLON returned to Rosarito to pick up the Vehicle. When they arrived at the convenience store, they again exchanged vehicles. When asked what she told BONILLA-COLON about these trips back and forth from Rosarito, PEREZ-LOPEZ stated that BONILLA-COLON did not ask any questions, and she told him that they were borrowing a car from a friend.[1]

---

[1] Counsel for PEREZ-LOPEZ has since submitted a letter to the U.S. Attorney's Office from PEREZ-LOPEZ, stating that BONILLA-COLON "did not have anything to do, and did not know anything about the events that took place on the day of June 1, 2019." Because of this letter, the U.S. Attorney's Office moved to dismiss the case against BONILLA-COLON without prejudice on June 27, 2019, and is continuing to investigate these charges.

21. PEREZ-LOPEZ was given the opportunity to use **Target Device 1** during the interview, where she entered her password and called her cousin.

22. While I was obtaining biographical information from BONILLA-COLON, he retrieved contact information from **Target Device 2**.

23. During the post-Miranda interview, BONILLA-COLON provided statements contradicted by PEREZ-LOPEZ's previous statements. Specifically, BONILLA-COLON stated that he and PEREZ-LOPEZ had been in possession of the Vehicle for the entire day. BONILLA-COLON denied knowing how the drugs ended up inside the Vehicle. I asked BONILLA-COLON if there was ever a time the Vehicle was out of his sight long enough for it to be stolen or tampered with, to which BONILLA-COLON responded that there was not, as he maintained that the Vehicle was in his possession the entire day. BONILLA-COLON made no mention of traveling back and forth to Rosarito, exchanging vehicles, or PEREZ-LOPEZ receiving any calls or texts from anyone while they were together.

24. I have reviewed the crossing history in the TECS system for the Vehicle and determined that the Vehicle has been crossing regularly into the United States (often multiple times in one week) since at least July 8, 2018. Further, on May 26, 2019, five days prior to their arrests, PEREZ-LOPEZ and BONILLA-COLON crossed into the United States in another vehicle – on that occasion, CBP officers had searched the vehicle due to a canine alert and found a non-factory access panel installed above the gas tank.

25. Given the facts surrounding PEREZ-LOPEZ's and BONILLA-COLON's arrests, and based upon my experience and training, as well as consultation with other law enforcement officers experienced in drug smuggling investigations, I submit that there is probable cause to believe that information relevant to the smuggling activities of PEREZ-LOPEZ and BONILLA-COLON will be found in the **Target Devices**. Such evidence, which could be in the form of communications, records, data (including but not limited to emails, text messages, other social messaging applications), photographs,

audio files, videos, or location data, is evidence:

    a.    tending to indicate efforts to import methamphetamine or some other federally controlled substance from Mexico into the United States;

    b.    tending to identify accounts, facilities, storage devices, and/or services–such as email addresses, IP addresses, and phone numbers–used to facilitate the importation of methamphetamine or some other federally controlled substance from Mexico into the United States;

    c.    tending to identify co-conspirators, criminal associates, or others involved in importation of methamphetamine or some other federally controlled substance from Mexico into the United States;

    d.    tending to identify travel to or presence at locations involved in the importation of methamphetamine or some other federally controlled substance from Mexico into the United States;

    e.    tending to identify the movement of proceeds associated with the trafficking of methamphetamine or some other federally controlled substance that was imported from Mexico into the United States;

    f.    tending to identify the user of, or persons with control over or access to, the **Target Devices**; and/or

    g.    tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

26.    Accordingly, based upon my experience and training, consultation with other law enforcement officers experienced in drug trafficking investigations, and all the facts and opinions set forth in this affidavit, there is probable cause to believe that information relevant to the drug smuggling and trafficking activities of PEREZ-LOPEZ and BONILLA-COLON, such as telephone numbers, made and received calls, contact names, electronic mail (e-mail) addresses, appointment dates, messages, pictures and other digital information are stored in the memory of the **Target Devices**. For the

9

reasons set forth above, I request permission to search the **Target Devices** for items listed in Attachment B for the time period from March 2, 2019 up to and including May 31, 2019, the day of PEREZ-LOPEZ's and BONILLA-COLON's arrests.

## METHODOLOGY

27. It is not possible to determine, merely by knowing the cellular/mobile telephone's make, model and/or serial number, the nature and types of services to which the device is subscribed and the nature of the data stored on the device. Cellular/mobile devices today can be simple cellular telephones and text message devices, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services, web services and rudimentary word processing. An increasing number of cellular/mobile service providers now allow for their subscribers to access their device over the internet and remotely destroy all of the data contained on the device. For that reason, the device may only be powered in a secure environment or, if possible, started in "flight mode" which disables access to the network. Unlike typical computers, many cellular/mobile telephones do not have hard drives or hard drive equivalents and store information in volatile memory within the device or in memory cards inserted into the device. Current technology provides some solutions for acquiring some of the data stored in some cellular/mobile telephone models using forensic hardware and software. Even if some of the stored information on the device may be acquired forensically, not all of the data subject to seizure may be so acquired. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography. This process is time and labor intensive and may take weeks or longer.

28. Following the issuance of this warrant, I will collect the subject cellular/mobile telephone and subject it to analysis. All forensic analysis of the data contained within the telephone and its memory cards will employ search protocols

directed exclusively to the identification and extraction of data within the scope of this warrant.

29. Based on the foregoing, identifying and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including manual review, and, consequently, may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within ninety (90) days, absent further application to this court.

## CONCLUSION

30. Based on all of the facts and circumstances described above, there is probable cause to conclude that MARIELA PEREZ-LOPEZ and PABLO BONILLA-COLON used the **Target Devices** to facilitate violations of Title 21, United States Code, Section(s) 952, 960, and 963.

31. Because the **Target Devices** was promptly seized during the investigation of MARIELA PEREZ-LOPEZ and PABLO BONILLA-COLON's trafficking activities and has been securely stored since that time, there is probable cause to believe that evidence of illegal activities committed by MARIELA PEREZ-LOPEZ and PABLO BONILLA-COLON continues to exist on the **Target Devices**. As stated above, I believe that the date range for this search is from March 2, 2019 to May 31, 2019.

32.   WHEREFORE, I request that the court issue a warrant authorizing law enforcement agents and/or other federal and state law enforcement officers to search the items described in Attachments A-1 and A-2, and to seize items listed in Attachment B, using the methodology described above.

I swear the foregoing is true and correct to the best of my knowledge and belief.

Gary Roy
Special Agent
Homeland Security Investigations
Department of Homeland Security

Subscribed and sworn to before me this 3rd day of July, 2019.

The Honorable Jill L. Burkhardt
United States Magistrate Judge

## ATTACHMENT A-2

PROPERTY TO BE SEARCHED

The following property is to be searched:

> Apple Cellphone
> FPF No. 2019250600082002
> **(Target Device 2)**

**Target Device 2** is currently in the possession of U.S. Customs and Border Protection Permanent Vault at 9495 Customhouse Plaza in San Diego, CA, 92154.

## ATTACHMENT B

### ITEMS TO BE SEIZED

Authorization to search the cellular/mobile telephone described in Attachment A includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular/mobile telephone for evidence described below. The seizure and search of the cellular/mobile telephone shall follow the search methodology described in the affidavit submitted in support of the warrant.

The evidence to be seized from the cellular/mobile telephone will be electronic records, communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data, for the period of March 2, 2019 to May 31, 2019:

a. tending to indicate efforts to import methamphetamine, or some other federally controlled substances from Mexico into the United States;

b. tending to identify accounts, facilities, storage devices, and/or services– such as email addresses, IP addresses, and phone numbers–used to facilitate the importation of methamphetamine, or some other federally controlled substances from Mexico into the United States;

c. tending to identify co-conspirators, criminal associates, or others involved in importation of methamphetamine, or some other federally controlled substances from Mexico into the United States;

d. tending to identify travel to or presence at locations involved in the importation of methamphetamine or some other federally controlled substances from Mexico into the United States, such as stash houses, load houses, or delivery points;

e. tending to identify the user of, or persons with control over or access to, the **Target Devices**; and/or

f. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above;

**which are evidence of violations of Title 21, United States Code, Sections 952, 960, and 963.**